REQUESTED BY: Senator Mark Quandahl Nebraska State Legislature Senator D. Paul Hartnett Nebraska State Legislature
LB 101 is a legislative bill relating to metropolitan utilities districts in Nebraska. Among other things, the bill would allow a metropolitan utilities district to treat members of its board of directors as employees of the district for purposes of participation in various health insurance programs. The pertinent portions of the bill specifically amend Neb. Rev. Stat. § 14-2104 to add a new section (3) as follows:
 Members of the board of directors [of a metropolitan utilities district] may be considered employees of the district for purposes of participation in medical and dental plans of insurance offered to regular employees. The dollar amount of any health insurance premiums paid from the funds of the district for the benefit of a member of the board of directors may be in addition to the amount of compensation authorized to be paid to such director pursuant to this section.
You have both asked similar questions regarding the constitutionality of LB 101 under art. III, § 19 of the Nebraska Constitution. Consequently, we will respond to all of your questions in the same opinion.
Art. III, § 19 of the Nebraska Constitution provides, as is pertinent:
 The Legislature shall never grant any extra compensation to any public officer, agent or servant after the services have been rendered . . . nor shall the compensation of any public officer, including any officer whose compensation is fixed by the Legislature, be increased or diminished during his term of office except that, when there are members elected or appointed to the Legislature or officers elected or appointed to a court, board, or commission having more than one member and the terms of one or more members commence and end at different times, the compensation of all members of the Legislature or of such court, board, or commission may be increased or diminished at the beginning of the full term of any member thereof.
Art. III, § 19 apparently applies to the activities of local governmental subdivisions. See Shepoka v. Knopik, 201 Neb. 780,272 N.W.2d 364 (1978) (Holding that the constitutional prohibition on increasing or decreasing the compensation of a public officer during his term of office was not violated when a county board passed a resolution granting cost of living salary increases to county officers over their term of office).
 INQUIRIES FROM SENATOR QUANDAHL
In your opinion request letter, you make the following comments with respect to LB 101:
 As with all insurance matters, there is much uncertainty about the premiums charged, the myriad of plan offerings, benefits provided, availability of coverage and necessity of coverage. I feel that it is very likely that an increase or diminishment of all of these factors would occur during the term of office of a member of [a metropolitan utilities] board of directors. This would make it not only possible, but also probable, that members would not be receiving equal compensation for their service.
You then pose three questions to us regarding LB 101 which we will consider separately below.
 Question 1. Does the inclusion of a section allowing members to be considered employees of a district for purposes of participation in medical and dental plans of insurance, and which, in addition allows health insurance premiums to be paid from district funds violate the Nebraska Constitution? (Article III, section 19)
There is nothing on the face of art. III, § 19 of the Nebraska Constitution which would flatly prohibit a metropolitan utilities district from allowing members of its board of directors to participate in health and dental insurance plans and from paying premiums for that coverage from district funds. However, as you point out, the parameters of health and dental insurance coverages available to employees of organizations often change with the implementation of new coverage options, new deductibles, different premiums, and so forth. Those changes, should they occur during an officer's term of office, implicate that portion of art. III, § 19 which prohibits increasing or decreasing an officer's compensation during his or her term, and presumably form the basis for your initial query.
It appears to us that the threshold question with respect to your first inquiry is whether health and dental insurance coverages along with premiums for those coverages can be considered as "compensation" which is included within the restrictions of art. III, § 19 in addition to the obvious compensation made up of an officer's salary. The answer to that question is not entirely clear.
The term "compensation" is not defined in the Nebraska Constitution, and we are aware of no Nebraska cases which define that term directly in the context of art. III, § 19. Authority from other jurisdictions also offers little assistance, since there are cases which indicate both that health insurance is and health insurance is not "compensation" for purposes of state constitutional provisions which prohibit increasing or decreasing an officer's compensation during his or her term of office.Compare Caldwell County Fiscal Court v. Paris, 945 S.W.2d 952
(Ky.Ct.App. 1997) (Holding that provision for health insurance under group policy covering county officials and employees did not constitute payment of compensation for purposes of state constitutional articles which prohibited changes in the compensation of public officers after their election) with OpinionBy The Justices, 30 So.2d 14, 249 Ala. 88 (1947) (Holding that benefits from group insurance may be considered as some compensation so that officers who had a fixed and unexpired term would not be entitled to those benefits under state constitutional provisions.)
In the face of such uncertainty, we believe that it is useful to consider the intent of the framers of the constitutional provision at issue. Our supreme court has indicated that the Nebraska Constitution is to be interpreted with reference to the established laws, usages, and customs of the country at the time of its adoption, and historical facts in connection with a constitutional amendment may be used to interpret the meaning of that amendment. Duggan v. Beermann, 249 Neb. 411, 544 N.W.2d 68
(1996); Dwyer v. Omaha-Douglas Public Building Commission,188 Neb. 30, 195 N.W.2d 236 (1972). The Nebraska Supreme Court has also indicated that the intent and understanding of the framers of the constitution and the people who adopted it as expressed in the instrument is the principal inquiry in construing it. State exrel. State Railway Commission v. Ramsey, 151 Neb. 333,37 N.W.2d 502 (1949). To assist in that inquiry, courts may consider the proceedings of the constitutional convention at which a section under consideration was adopted, including the reports of committees, debates and colloquies between members. State ex rel.Johnson v. Marsh, 149 Neb. 1, 29 N.W.2d 799 (1947).
The provision in the Nebraska Constitution dealing with increasing or decreasing the compensation of public officers during their term of office has been in the Nebraska Constitution since at least 1875. Nebraska Constitution of 1875, art. III, § 16. It was amended as a result of the state Constitutional Convention in 1919-1920 to apply to any public officer including those officers whose compensation is fixed by the Legislature, and the discussions and events of that constitutional convention are instructive.
The amendment to the Nebraska Constitution at issue was brought before the convention as Proposal No. 71. During debate on the proposal, one of the delegates stated:
 The purpose of these amendments to the Constitution is to extend that prohibition in the former Constitution to other officers than Constitutional officers. That is the only change that has been made. The courts have decided in this matter that this Constitutional provision only applied so far as public officers were concerned to Constitutional officers. That has been known by all those who have been in the Legislature for years, that the county officers and other officers whose salary is being fixed from time to time by the Legislature have formed in this state a very close connection. Prior to the convening of every Legislature for practically the last fifteen years these men have met in Lincoln, or some other central place in the state, and have delegated to certain members authority to appear before the Legislature as a lobby, their object being since they are elected to try and get the Legislature to raise their salaries. This works out in this way: It does not give them all an equal opportunity along this line. Those who have the best lobby here and who, perhaps, are the least worthy of a raise in salary are the ones who get their salary raised. Others, perhaps, who ought to have their salaries raised, fail because they do not have a sufficient lobby, or do not have the right members of the Legislature upon their side. I say it is a straight business proposition that when a man is elected to office, while his salary, perhaps, should be raised, yet I think that that man is not the man to say his salary should be increased. I think the Legislature should be relieved of a lobby here year after year with no other purpose except to get the Legislature to continually raise these salaries.
Proceedings of the Nebraska Constitutional Convention, 1919-1920, p. 2199 (Remarks of Mr. Byrum) (emphasis added). In addition, when the constitution was presented to the people of Nebraska after the constitutional convention in 1919-1920, an Address to the People was prepared by the convention which explained the various changes proposed for the state constitution. The purpose for the changes in the section that ultimately became art. III, § 19 was explained as follows:
 Amended Section 16, submitted as No. 10 on the ballot, extends the provision of the old section so that the Legislature shall never grant any extra compensation to any public officer, agent or servant after the services have been rendered, nor to any contractor after the contract has been entered into, including any officer whose compensation is fixed by the Legislature. The purpose of this amendment is to prevent the increase of the salary of a public official during his term of office and to prevent or discourage lobbying in favor of increase of salary.
Proceedings of the Nebraska Constitutional Convention, 1919-1920, p. 2842 (emphasis added).
As a result, the focus of the Constitutional Convention in 1919-1920 with respect to art. III, § 19, was the salaries of public officers, and that is what was presented to the people of the state when they voted on and approved that constitutional amendment. For that reason, we believe that "compensation," as it is used in art. III, § 19, refers to the salaries of public officers, and not to additional benefits such as health and dental insurance or the premiums for such items which are normally separate and apart from an officer's salary.
Our conclusion with respect to the meaning of "compensation" in art. III, § 19 and the nature of health insurance benefits is also consistent with the purposes underlying that constitutional provision. Art. III, § 19 ". . . was designed to protect the individual officer against legislative oppression, and further, to curb the activities of public officers in lobbying to induce the Legislature to increase salaries." Ramsey v. GageCounty, 153 Neb. 24, 32, 43 N.W.2d 593, 597 (1950). Art. III, § 19 aids in the separation of powers and ". . . is one of the oldest of the `checks and balances' provided in the federal Constitution and in the Constitutions of most, if not all, of the states." State ex rel. Johnson v. Marsh, 149 Neb. 1, 6,29 N.W.2d 799, 802 (1947). Allowing public officers to participate in health insurance plans on the same basis as public employees as is contemplated by LB 101 would result in a situation where any changes in coverage, premiums, and so forth similar to those described in your opinion request would presumably be experienced by public officers and public employees on the same basis. It is difficult to understand, under those circumstances, how changes in dental and health coverages could be used as a means of legislative oppression against individual officers, since officers and employees would treated alike. It is also difficult to understand how changes in those coverages under those circumstances would lead to increased lobbying for more individual benefits for public officers.
We would point out, however, that our conclusion regarding the nature of "compensation" under art. III, § 19 might be somewhat different if changes in health insurance benefits or premium changes were directed against or to one particular officer or group of officers for obvious retaliatory reasons or to increase the salaries of those individuals alone. In CaldwellCounty Fiscal Court v. Paris, 945 S.W.2d 952 (Ky.Ct.App. 1997), the Kentucky Court of Appeals held that providing health insurance under a group policy covering county officials and employees did not constitute payment of compensation for purposes of state constitutional articles which prohibited changes in the compensation of public officers after their election. However, the court also stated:
 It should be understood that we are not holding that the payment of a "fringe benefit" to a public official can never amount to "compensation" under the constitution. If, for example, some scheme were devised to raise the salary of a particular official through the subterfuge of paying certain benefits for him not uniformly available to similarly situated officials, that scheme would not likely pass constitutional muster.
Id. at 955. We believe that similar reasoning applies to health insurance benefits under art. III, § 19.
We are aware of the fact that the Nebraska Supreme Court has indicated that pensions for public employees are a form of compensation under art. III, § 19. Wilson v. Marsh,162 Neb. 237, 75 N.W.2d 723(1956). See also Halpin v. The Nebraska StatePatrolmen's Retirement System, 211 Neb. 892, 320 N.W.2d 910
(1982) (Stating that pension payments constitute deferred compensation for services rendered.) Those cases obviously could be used to support the argument that health insurance coverages and premiums are a form of fringe benefit similar to pensions, and for that reason, are compensation under art. III, § 19. However, we believe that the pension cases are distinguishable from the present situation involving health insurance coverages and premiums primarily because pensions are much more closely related to salary than are health insurance benefits. In essence, pensions may be characterized as a form of salary which is deferred. As noted in Gossman v. State Employees RetirementSystem, 177 Neb. 326, 331, 129 N.W.2d 97, 101 (1964):
 The benefit of the retirement system awarded to a member thereof who renders services under the act creating the system after its enactment is not a grant of extra compensation after the services are rendered which the Constitution condemns because the increase in pay is granted immediately and from the date of the grant is being currently earned.
(Original emphasis deleted and additional emphasis added). Similarly, in the Wilson case the court quoted State ex rel. Senav. Trujillo, 46 N.M. 361, 129 P.2d 329 (1942): "`Pensions' for state employees are pay withheld . . ." 162 Neb. at 254,75 N.W.2d at 733 (Emphasis added). In our view, since pensions may be considered as deferred salary, they fall under art. III, § 19, while health insurance benefits and premiums do not.
Finally, we would take note of our Opinion No. 246, dated August 2, 1976, in which we concluded that a county board could not change the health insurance provided to an elected county official during his term of office from family coverage to single coverage based upon art. III, § 19. 1975-76 Rep. Att'y Gen. 353 (Opinion No. 246, dated August 2, 1976). That opinion did not discuss the Constitutional Convention of 1919-1920 or any other relevant authorities pertaining to art. III, § 19, and to the extent that it conflicts with this opinion, we believe that it is incorrect.
In sum, it seems to us that health and dental insurance coverages and premiums paid for those benefits are not "compensation" subject to the strictures of art. III, § 19 of the Nebraska Constitution, when, as is the case with LB 101, the officers receiving those benefits are treated uniformly with other officers and employees of the agency providing the benefits. Under those circumstances, health and dental insurance coverages and the premiums for those benefits are not part of the "salary" of those public officials.
 Question 2. If all members of a board do not uniformly participate in medical and dental plans of insurance, would that violate any provisions of the Nebraska Constitution, including the equal protection clause?
The equal protection provisions of the state and federal constitutions generally prohibit improper disparate treatment or improper classifications of people who are otherwise similarly situated. As a result, the initial inquiry in any equal protection analysis focuses on whether there is a classification involved in government action where one individual is treated differently than others in the same situation. Gramercy HillEnterprises v. State of Nebraska, 255 Neb. 717, 587 N.W.2d 378
(1998). Absent such disparate treatment or classification, there is no equal protection claim. Id.
We are not entirely sure what classifications of board members are at issue in your second question, since it appears to us that all members of a metropolitan utilities district board would be offered the same opportunities for health insurance and dental coverages under LB 101, and any differences in participation would result from the individual choices of the directors involved. However, to the extent that there are classifications inherent in that bill which might be subject to equal protection challenge, "[t]he general rule is that legislation is presumed to be valid and will be sustained if the classification drawn by the statute is rationally related to a legitimate state interest." Robotham v. State, 241 Neb. 379, 385,488 N.W.2d 533, 539 (1992). There are two exceptions to that rule involving "suspect classifications" based upon race, age, national origin, etc., and involving classifications pertaining to fundamental rights. Clements v. Fashing, 457 U.S. 957 (1982);Robotham v. State, supra. To sustain the constitutional validity of classifications in those latter areas, there must be a showing of a compelling state interest. Robotham v. State, supra.
In the present instance, we are not aware of any suspect classifications or fundamental rights implicated by LB 101. Therefore, courts reviewing an equal protection challenge to that statute would ask only if a rational relationship exists between a legitimate state interest and the means selected by the Legislature in LB 101 to achieve that end. Schindler v.Department of Motor Vehicles, 256 Neb. 782, 593 N.W.2d 295 (1999). We cannot say that there is no rational relationship between legitimate state interests and any classifications created by LB 101. However, to the extent that particular classifications cause you concern, we suggest that you take steps to create an appropriate legislative history or language in the statute which articulates the state interests which led to the classifications created by the Legislature.
 Question 3. What would be the proper course of action for a board to take if it has paid unequal compensation to its directors?
We have frequently stated, over time, that we will limit our opinions for members of the Legislature to instances where the questions posed to us involve a legislative purpose growing out of pending or proposed legislation. Op. Att'y Gen. No 157 (December 24, 1985). Under that standard, we are uncertain what legislative purpose is implicated in your third question. Moreover, metropolitan utilities districts and other governmental subdivision boards are represented by their own counsel who presumably would be in a much better position to advise those boards as to the proper course of action if they paid unequal compensation to their directors than this office. In any event, it appears to us that your final question is, in great degree, mooted by our response to your Question No. 1. For those reasons, we will not respond further to your third question.
 INQUIRIES FROM SENATOR HARTNETT
In your opinion request letter, you state that you concur with the concerns raised by Senator Quandahl, but that you have an additional issue which you would like to present to us. The Urban Affairs Committee of the Legislature apparently considered an amendment to LB 101 which would have stricken the following language from the new section (3) proposed for § 14-2104 quoted at the beginning of this opinion:
 The dollar amount of any health insurance premiums paid from the funds of the district for the benefit of a member of the board of directors may be in addition to the amount of compensation authorized to be paid to such director pursuant to this section.
You have three additional questions in light of that amendment.
 Question 1. Does the "dollar amount of health insurance premiums paid from district funds" constitute "compensation" to the director for purposes of ARTICLE III, Section 19 of the State Constitution?
For the reasons discussed at length above, we believe that health insurance benefits along with any premiums paid for those benefits which are separate and apart from an officer's salary are generally not "compensation" for purposes of art. III, § 19 of the Nebraska Constitution. As a result, the dollar amount of health insurance premiums paid from metropolitan utilities district funds for a director of that district apart from the director's salary does not constitute "compensation" to the director under that state constitutional provision.
 Question 2. If it is "compensation," would annual (those occurring mid-term) increases or decreases in premium charges or changes in the benefits provided (such as a higher deductible, a loss of coverage on certain conditions, or an expansion of coverage for others, etc.) constitute unlawful increases or diminishments in compensation in contravention of ARTICLE III, Section 19?
Since we have determined that, in our view, the dollar amount of health insurance premiums paid from metropolitan utilities district funds for a director of that district apart from the director's salary does not constitute "compensation" to the director, we need not respond further to this question.
 Question 3. Would the answers to questions #1 and #2 be different (a) if the dollar amount of the health premiums were paid by a deduction of the dollar cost of the premium from the salary of a participating board member, with all directors paid the same basic salary, but those participating in the health insurance program actually receiving less (a smaller check) because of the premium deduction or (b) if the full salary was paid all directors and individual directors wishing to participate in the health insurance program were permitted to purchase "into" the employee health insurance program with their own funds?
As discussed above, it is our view that the term "compensation" in art. III, § 19 of the Nebraska Constitution refers primarily to the "salary" of public officers, and therefore, the strictures of that constitutional provision are focused on matters affecting an officer's salary. As a result, we believe that there is a potential problem under art. III, § 19 if the proposals set out in your Question 3 involve changes to metropolitan utilities district directors' salaries during their terms in order to cover the costs of health insurance premiums, whether the health insurance premiums are deducted from those salaries or paid separately. For example, with respect your proposal (a), if $2000 were added to all directors' salaries to cover the cost of health insurance in one year and $2500 added the next, then there would be an increase in the salaries for those directors during their term and an increase in their compensation, whether deductions were made for that health insurance or not.[1] The same would be true under your proposal (b) if the salaries for all directors were raised in the second year of the biennium to cover health insurance premiums, and participating directors paid their health care costs directly. The operative fact in both proposals is that the salaries of directors would be changed during their term. On the other hand, if your Question 3 contemplates no changes in directors' salaries during their biannual term, and metropolitan utilities district directors would simply be allowed to participate in health insurance coverages by deduction or separate payment, then we do not believe that art. III, § 19 would be compromised.
Sincerely yours,
 DON STENBERG Attorney General
 Dale A. Comer Assistant Attorney General
cc. Patrick O"Donnell Clerk of the Legislature
Approved by:
________________________________ Attorney General
[1] Under Neb. Rev. Stat. § 32-540 (1998), two or three members of the seven-member board of directors of a metropolitan utilities district are elected in even-numbered years, so that members serve staggered terms with new terms beginning every two years.